IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MW BUILDERS, INC., a Missouri
corporation; and GREAT AMERICAN
ALLIANCE INSURANCE COMPANY,
an Ohio corporation,

                    Plaintiffs,

        v.

SAFECO INSURANCE COMPANY OF
AMERICA, a Washington corporation;
SAFECO INSURANCE COMPANY OF
OREGON, an Oregon corporation;
AMERICAN STATES INSURANCE
COMPANY, an Indiana corporation;
ELLIOTT, POWELL, BADEN & BAKER,
INC., an Oregon corporation; REX &
COMPANY, an Oregon company;
LAWRENCE REX ESTATE, dba REX &
COMPANY (by and through its personal
representative, L.V. Rex); and LAWRENCE
REX TRUST (by and through its Trustee,
L.V. Rex),

                    Defendants.

CV 02-1578-AC

FINDINGS AND RECOMMENDATION

_____

Page 1 - FINDINGS AND RECOMMENDATION                                    [LB]

ACOSTA, Magistrate Judge:

This dispute between MW Builders Inc. ("MW Builders") and SAFECO Insurance Company of America ("SAFECO") returns to the district court from the Ninth Circuit by way of a remand. *See MW Builders, Inc., et al. v. SAFECO Insurance Company of America, et al.*, 267 Fed. Appx. 552 (9th Cir. 2008). In an unpublished Memorandum, the Ninth Circuit remanded the following issues for this court's consideration:

(1)    Determine what portion of the $620,000 award should be attributed to the Hotel damage claim as distinguished from the exterior insulation and finishing system ("EIFS") repair claim.

(2)    Determine whether MW Builders, Inc. is entitled to coverage under the commercial general liability ("CGL") policies as an "additional insured" for damages caused by Portland Plastering's "ongoing operations."

(3)    Determine whether coverage is limited under the CGL policies to a single $500,000 occurrence.

*Id.* at 555.

On April 15, 2008, this court held a status conference and, among other things, ordered the parties to submit memorandums setting forth their respective positions concerning what, if any, issues remain for the court's determination. In accordance with the court's order, MW Builders and SAFECO submitted separate memorandums and supporting documents.

After a careful review of both parties' submissions, and in accordance with the Ninth Circuit's ruling, on July 9, 2008, the court directed the parties to conduct discovery, as necessary, on the questions of: (1) what portion of the $620,000 award should be attributed to the Hotel damage claim as distinguished from the EIFS repair claim; (2) the cause of damage to the Hotel for purposes of determining whether MW Builders is entitled to coverage for "ongoing operations"

under the 1997-98, 1998-99, and 1999-2000 CGL policies.  The court further ordered the parties to submit dispositive cross-motions after discovery closed on the issues of:  (1)  what portion of the $620,000 award is attributed to the Hotel damage claim as distinguished from the EIFS repair claim; (2) whether MW Builders is entitled to coverage under the CGL policies as an "additional insured" for damages caused by Portland Plastering's "ongoing operations;" and (c) whether coverage is limited under the CGL policies to a single $500,000 occurrence.

In accordance with the court's July 9 Order, the parties filed cross-motions for summary judgment.  Oral argument was heard on the cross-motions and, for the reasons that follow, MW Builders' Renewed Motion for Summary Judgment Following Ninth Circuit Remand should be, granted, in part, and denied, in part.  Further, SAFECO's Motion for Summary Judgment Pursuant to July 9, 2008 Order should be denied.

### Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment is not proper if material factual issues exist for trial.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.  *Id*. at 324.  Assuming that there has been sufficient time for discovery, summary judgment should be entered against "a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

*Discussion*

The facts of this dispute are well known to the parties and the court, and have been recited on numerous occasions. As such, only facts that pertain to the legal analysis of the issues presented for the court will be set forth below. Because there are no disputed material facts, the court can decide the cross-motions as a matter of law.

I.    Arbitrator Knoll's $620,000 Award

In June 2003, MW Builders proceeded to arbitration against Portland Plastering seeking reimbursement for the $2 million paid out to Larkspur in settlement of Larkspur's claims against MW Builders. James Knoll, the arbitrator appointed to resolve the dispute, determined that the fault of Portland Plastering caused 31% of the damages sustained by the Hotel owned by Larkspur. In accordance with that determination, Knoll awarded $620,000 in settlement damages (31% of the $2,000,000 Larkspur settlement) to MW Builders. This award was for reimbursement of the money paid by MW Builders to Larkspur for damage to the Hotel caused by Portland Plastering.

This court found that the CGL policies SAFECO issued to Portland Plastering obligated SAFECO to pay Portland Plastering's portion of Knoll's award. *See MW Builders, Inc., et al. v. SAFECO Insurance Company of America, et al.*, CV No. 02-1578-AC (J. Haggerty's Order dated May 18, 2005). The Ninth Circuit determined, however, that Knoll's findings did not partition the $620,000 award into "those costs associated with the damage to the Hotel and those costs associated with the replacement of the faulty EIFS." *MW Builders Inc.*, 267 Fed. Appx. at 555. Because only

the costs associated with the damage to the Hotel were recoverable under the SAFECO CGL policies, the appeals court directed this court "to make such a determination in the first instance." *Id.*

SAFECO insists that it is impossible to determine what portion of the settlement funds are allocable to the covered damages because the Settlement Agreement between Larkspur and MW Builders did not provide an allocation. (Def.'s Mem. Pursuant to Order 7.) SAFECO relies on the Minnesota Supreme Court's decision in *Bob Useldinger & Sons Inc. v. Hangsleben,* to argue that the Settlement Agreement is not enforceable. 505 N.W.2d 323, 331 (1993) ("No efficient method exists here to allocate liability among various parties who have not been adjudicated liable.") SAFECO maintains that MW Builders cannot carry its burden of proving what portion of the settlement was allocated to EIFS cladding repairs versus damage to the Hotel. Further, any effort to allocate the settlement funds in accordance with the intention of the settling parties, Larkspur and MW Builders, would required the fact finder to speculate, which is impermissible under Oregon law. Accordingly, "MW Builders is not entitled to recover any part of the $620,000 arbitration award." (Def.'s Mem. Pursuant to Order 8.)

Alternatively, SAFECO contends that MW Builders' request for allocation between covered and non-covered damages is an equitable task for the court. *See, e.g., Voest Alpine Indus. v. Zurich American Ins. Co.*, No. 2:02 cv 1605, 2007 WL 1175750 (W.D. Pa. April 20, 2007) ("Where an insured settles liability that is based on covered and non-covered claims without a contemporaneous apportionment between the two, then the proper procedure is for the court to make an equitable apportionment of the settlement."). SAFECO asserts that because this is an action at law – breach of an insurance contract – MW Builders is not entitled to an equitable remedy. According to

SAFECO, "MW Builders must prove the proper allocation on the law side of the court." (Def.'s Mem. Pursuant to Order 10.)

Finally, SAFECO submits that if the court determines an equitable apportionment is required, the apportionment should be based "on the actual repair costs incurred by Larkspur." Larkspur hired Mega Pacific Construction Company ("Mega Pacific") to repair the Hotel. (Baran Decl. App. 58-75, September 29, 2008.) When the repair project was completed, Mega Pacific itemized the repairs in the final cost analysis and cost summary. (Baran Decl. App. 76-78.) SAFECO contends that the costs unrelated to either the recladding work/water damage repair, and the costs related partly to the recladding work/water damage repair should both be excluded from the allocation calculation, leaving only repair expenses incurred solely to repair consequential water damage and those required to replace the EIFS cladding.

According to SAFECO, the total of the EIFS cladding replacement costs ($862,424) and the consequential water damage repair costs($252,466) is $1,114,890, with the cladding replacement costs being 77 % and the consequential water damage repair costs being 23 % of the total. SAFECO applies the percentages to the $620,000 settlement award to maintain that only $142,600 related to the consequential water damage repairs is covered under an equitable allocation.

Conversely, MW Builders requests the court to apportion the entire $620,000 settlement award as costs to repair consequential water damage to the Hotel. According to MW Builders, such an award is required because property damages sustained by Larkspur in the amount of $1,403,727, well exceeded the $620,000 award. Further, Larkspur never pursued claims for damages to the EIFS in the Settlement Agreement. MW Builders requests the court to "evaluate Larkspur's damages by examining those damages actually incurred by Larkspur at the time of the settlement as well as the

*estimated* costs to repair the property damages to the Hotel at the time of the settlement." (Pl.s'
Mem. Summ. J. 17 (emphasis in original).)

Next, MW Builders insists that the cost of installing the EIFS was required in order to replace
the moisture damaged and decayed exterior sheathing and wood repair of the Hotel. According to
MW Builders, the Mega Pacific repair project required removal of the EIFS cladding. Had the
problems with the Hotel involved only the installation errors in the EIFS and caulking system, with
no resulting property damages, the EIFS problems could have been resolved with spot repairs and
applying a skim coat over the existing EIFS system. (Pl.'s Mem. Summ. J. 20.) Simply put, removal
of all of the EIFS cladding so that rotted framing and structural components could be identified and
replaced was required to repair the extensive damage to the Hotel caused by Portland Plastering's
faulty work. Nevertheless, even if the court were to deduct the cost to install the replacement
cladding ($618,634), the post-settlement actual property damages incurred was $785,093
($1,403,727 minus $618,634). Accordingly, MW Builders requests the court to award the entire
amount, $620,000, as costs to repair the Hotel.

As a threshold matter, the court rejects SAFECO's argument that MW Builders is not entitled
to any portion of the $620,000 award because it is unable to prove what amount of the settlement
was allocated to EIFS cladding repairs versus damage to the Hotel and, thus, an award by the court
would be speculative. Were the court to adopt this argument, MW Builders would receive no
damages despite having proved a loss covered under the SAFECO CGL policies, a loss which
SAFECO refused to defend. Further, as a policy matter, a defendant, such as SAFECO, should not
profit from its insured's difficulty in proving exact damages, particularly if defendant's breach

contributed to that difficulty. *See, e.g., Milgard Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703, 710 (9th Cir. 1990).

Earlier in these proceedings, MW Builders proved a covered loss under the CGL policies. Indeed, the Ninth Circuit affirmed this court's determination that the SAFECO CGL policies provided coverage for MW Builders' claim. *See MW Builders Inc.*, 267 Fed. Appx. at 554. Under Oregon law, once a breach of contract has been established, a plaintiff is required only to submit evidence that provides the court a sufficient basis for estimating the damage amount with reasonable certainty. *See generally Douglas Construction Corp. v. Mazama Timber Products, Inc.*, 256 Or. 107, 111-12, 471 P.2d 768 (1970); *see also* Restatement (First) of Contracts § 331 (2008) ("Damages are recoverable for losses caused . . . by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.") For the reasons set forth below, the court finds that MW Builders has met that burden here and, thus, it is for the court to determine what portion of the $620,000 award is covered "property damage" to the Hotel.

The insuring agreement set forth in the four SAFECO CGL policies provides, in part, that SAFECO "will pay those sums that the insured [Portland Plastering] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (Murphy Aff. Ex. C at 4, Sept. 29, 2008.) The CGL "insurance applies to . . . 'property damage' only if: [t]he . . . 'property damage' is caused by an 'occurrence.'" The CGL policies define "property damage," in part, as "[p]hysical injury to tangible property, including all resulting loss of use of that property." (Murphy Aff. Ex. C at 15.) The term "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Murphy Aff. Ex. C at 14.)

Turning first to the repair costs for the faulty EIFS installation, the Oregon Supreme Court has held that poor workmanship is not an "occurrence" and therefore, no coverage exists where the only damage suffered was to the insured's property and not that of a third-party. *See Oak Crest Construction Co. v. Austin Mutual Insurance Co.*, 329 Or. 620, 626-27, 998 P.2d 1254 (2000) (Costs incurred by general contractor to remove and replace subcontractor's painting work on cabinets and woodwork was not covered under a CGL policy as the damages did not arise from an "accident."); *see also California Insurance Co. v. Stimson Lumber Co.*, No. 01-514-HA, 2004 WL 1173185, at *6 (D. Or. May 26, 2004). Generally, courts are unwilling to transform a CGL policy into a warranty or performance bond for a contractor's workmanship. *See Stimson Lumber*, 2004 WL 1173185, at *6. The Ninth Circuit explained:

> General liability policies . . . are not designed to provide contractors and developers with coverage against claims their work is inferior or defective. The risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer. Rather liability coverage comes into play when the insured's defective materials or work *cause injury to property other than the insured's own work or products*.

*Anthem Elec., Inc. v. Pac. Employers Ins. Co.*, 302 F.3d 1049, 1057 (9th Cir. 2002) (emphasis in original); *accord Burlington Insurance Co. v. Oceanic Design & Construction, Inc.*, 383 F.3d 940, 948-49 (9th Cir. 2004).

Applying Oregon law, the Ninth Circuit affirmed this court's earlier ruling and held that "[f]or a claim of faulty workmanship to give rise to 'property damage,' a claimant must demonstrate that there is damage to property separate from the defective property itself." *MW Builders, Inc.*, 276 Fed. Appx. at 554. Accordingly, the Ninth Circuit held that "the damages that occurred to the [Hotel] as a result of the faulty installation of . . . [the EIFS] by Portland Plastering – rather than any

damages associated with the actual replacement of the EIFS – satisfy this criteria." *Id.* Pursuant to this court's earlier ruling, affirmed by the Ninth Circuit, and in accordance with Oregon case law, the court finds that the cost to remove and replace the EIFS is not covered property damage under the CGL policies.

The parties agree that the Hotel suffered consequential water intrusion and damage. Because of the faulty EIFS installation water entered the Hotel and damaged the framing members, interior wall spaces, sheathing, drywall, insulation, joists, and other building components. Arbitrator Knoll found that Portland Plastering's defective and improper EIFS caused the water infiltration damages to the Hotel between 1997 and 2000. Specifically, Knoll stated:

> A significant cause of the repair costs were attributable to the application of the EIFS and the caulking of the EIFS around the penetrations[.]
>
> . . . .
>
> Portland Plastering did proceed and apply the EIFS, despite knowing in many cases its installation of the EIFS was wrong and would cause problems down the road and despite its responsibilities under its contract with MW Builders. . . . Additionally, it cut the v-grooves to [sic] deeply, failed to install properly the mesh, base coat and finish coat in some areas and failed to properly caulk the penetrations contrary to the STO installation specifications. . . . In particular when caulking the PTAC units, Portland Plastering's subcontractor failed to install the correct or any caulk joints.
>
> . . . .
>
> Finally, the failure of Portland Plastering to install properly the EIFS and caulking and its failure to submit written concerns as required by its contract also contributed to the damage.

(Baran Decl. App. 253-56.)

MW Builders has offered evidence that "removal of the of the entire EIFS cladding was the only way for the [Hotel] owners to remove and replace the widespread property damage (rotted and

decayed framing, sheathing, and structural components) caused by Portland Plastering's faulty work . . . ." (Pl.'s Mem. Summ. J. 8, Bredal Aff ¶¶ 22-23.). And that "but, for" the water intrusion, the faulty EIFS could have been repaired by skim coat and patch work. (Hansen Aff. ¶ 5.) While it is undisputed that the cost to repair the Hotel, excluding the EIFS removal and replacement, exceeded $620,000, the court declines to award MW Builders the full amount of Knoll's award. MW Builders' request for the court to do so ignores the risk inherent in settlement, MW Builder's own culpability for the damages, and the Ninth Circuit's directive that this court make a determination of what portion of the 620,000 was attributable to damages to the Hotel and not the faulty installation of the EIFS. Despite some evidence that the EIFS could have been skim coated and patched but for water intrusion, the case law bars recovery for faulty work; in fact, the law is clear that a CGL policy is not intended to cover bad workmanship. The limited exception for faulty workmanship that causes property damage to a third party should not be expanded in this instance to cover the inferior work by Portland Plastering. An argument that "but, for" the extensive water intrusion caused by the faulty work the EIFS would not have needed to be replaced and, therefore, the removal and replacement of the EIFS should be covered, is circular and would ignore well established law that recovery under a CGL policy for faulty workmanship is not permitted.

As set forth above, it was previously determined by the court that the consequential water damage to the Hotel caused by Portland Plastering's faulty installation is covered property damage under the SAFECO CGL policy. *See MW Builders, Inc.*, 267 Fed. Appx. at 554-55. MW Builders alleged here that SAFECO must indemnify it because the damages arose from moisture and water intrusion into the Hotel, i.e., property damage, caused by Portland Plastering, its insured. For example, MW Builders alleged in its First Amended Complaint, in part, that:

Page 11 - FINDINGS AND RECOMMENDATION                                    [LB]

After the hotel was built, Larkspur made claims against MW Builders, alleging that the Candlewood Suites had been and was being damaged by moisture and water intrusion into the hotel. [MW Builders] tendered defense and indemnity of the claims to responsible third parties, including Portland Plastering, based on the terms of the subcontract. [MW Builders] also specifically demanded that Portland Plastering immediately notify its insurer of the claim on its own behalf and on behalf of MW Builders as an additional insured.

. . . .

[MW Builders] paid monies to defend and to settle the claims asserted by Larkspur based upon work performed by Portland Plastering. [MW Builders] seek[s] to recover those damages in this case.

(First Am. Compl. ¶¶ 3.8, 3.15.)

SAFECO declined to defend or indemnify MW Builders in the Larkspur action pursuant to the CGL policies issued to Portland Plastering. Subsequently, the Larkspur dispute was settled and MW Builders sought recovery of Portland Plastering's share of liability through arbitration. It is undisputed that Portland Plastering was liable for some of the damages to the Hotel caused by the water intrusion resulting from its defective work. SAFECO cannot now argue as a result of the Larkspur settlement and subsequent arbitration that MW Builders is not entitled to recover some of that amount because it is too speculative. Because the First Amended Complaint alleged that Portland Plastering's faulty installation of EIFS caused damage to the entire Hotel, thereby diminishing its value, the court concludes that MW Builders' claims, excluding the faulty work, seek damages arising from covered property damage.

In sum, the court has determined that MW Builders established a loss covered by the SAFECO CGL policies, i.e., "sums that the insured [was] legally obligated to pay because of . . . 'property damage;'" that there is no coverage under the CGL policies for the cost of removing and replacing the EIFS; and, that Knoll awarded MW Builders $620,000, 31% of the Larkspur settlement

Page 12 - FINDINGS AND RECOMMENDATION                                    [LB]

amount, against Portland Plastering for the harm caused to the Hotel by Portland Plastering (Knoll found that MW Builders and its architect must bear liability for the remainder of the Larkspur settlement). Additionally, as detailed below, the Larkspur settlement comprised four categories of expenses that were considered in reaching the settlement with MW Builders: Mega Pacific's estimate to repair the damage to the Hotel, including removing and replacing the EIFS; investigation and repair costs; professional design and consultant costs; and lost use. Thus, to calculate what portion of the $620,000 award is attributed to the Hotel damage claim, excluding the EIFS repair claim, the court will determine what percent of the total $2 million settlement award was covered property damage and apply that percentage amount to the $620,000 award by Knoll. This approach to apportionment finds support in comparable contexts. *See, e.g., Milenbach v. C.I.R.*, 318 F.3d 924, 932 (9th Cir. 2003) ("When a claim is resolved by settlement, the relevant question for determining the tax treatment of a settlement award is: 'In lieu of what were the damages awarded?'" (quoting *Getty v. Commissioner,* 913 F.2d 1486, 1490 (9th Cir. 1990)); *see also Francisco v. United States*, 267 F.3d 303, 319 (3d Cir. 2001) ("To maintain tax equality between settlements and court awards, we determine the tax implications of a settlement by ascertaining the obligation or claim initially resolved by judgment in lieu of which the settlement was made.") Thus, the court must look first to the settlement with Larkspur.

In its Demand for Arbitration, Larkspur alleged claims against MW Builders, Inc. for negligence, breach of contract, breach of warranty/guaranty, indemnification, and products liability arising out of damages caused by moisture and water intrusion into the Hotel. (Murphy Aff. Ex. 20, filed Nov. 17, 2003.)   Larkspur identified the sources of the water intrusion to include EIFS installation and product defects, and sought repair costs, lost revenues, investigation and consultant

costs, and attorneys fees. (Murphy Aff. Ex. 20.) Similarly, in its Demand for Arbitration, MW Builders alleged identical claims against Portland Plastering, and included a claim for contribution. (Murphy Aff. Ex. 25.)

During the arbitration proceedings against MW Builders, Larkspur determined its damages were in the range of $2.3 to $2.8 million. (Hansen Aff. ¶ 7, Ex. A.) The damages estimate included a bid from Mega Pacific in the amount of $1,543,421 for repair to the exterior walls of the Hotel. (Hansen Aff. ¶ 9, Ex. B.) The record reveals that $629,960 of that amount was expended to remove and replace the faulty EIFS. (Miller Dep. Ex. 3 at 2.) Accordingly, the repair to the Hotel, excluding the EIFS portion, was $913,461. Additionally, Larkspur's property damages included past investigation and repair costs in the amount of $96,205.69 (Hansen Aff. ¶ 7, Ex. A at Lns. 102-06, 201-02, 303, 402-03 and 501); professional design and consultant work by Larkspur's architect, Jan Bredal, in the amount of $90,042.61 (Hansen Aff. ¶ 7, Ex. A at Lns.1011-12; Bredal Aff. ¶¶ 13-15); and Larkspur's lost use during the repairs in the amount of $100,000 (Hansen Aff. ¶ 11, Ex. A at Ln. 505). At the time of settlement, the estimated property damages totaled $1,829,669.30.

Based on the recommendations of its counsel, Gregory L. Baird, and experts retained to value the damages to the Hotel, MW Builders offered $2 million in full settlement of Larkspur's claims. (Baran Decl. App. 240 at ¶ 21.) On February 22, 2002, counsel for Larkspur, Eric A. Grasberger, advised that Larkspur would accept the offer of $2 million to settle all claims against MW Builders. (Baran Decl. App. 240 at ¶ 22.)

The percent of the total settlement amount for each of the four categories is as follows: Mega Pacific's estimate to repair the damage to the Hotel, minus the EIFS costs, was $913,461, or 45.7% of the $2 million total; the investigation and repair costs were $96,205, or 4.8%; the professional

Page 14 - FINDINGS AND RECOMMENDATION                                    [LB]

design and consultant costs were $90,042, or 4.5%; and the lost use was $100,000 or 5%. Based on this partitioning of MW Builders' settlement with Larkspur, the percent amount that may be applied as covered property damage to Knoll's $620,000 award is 60%. Accordingly, the court finds that MW Builders should be entitled to recover $372,000 (60% of $620,000), under the SAFECO CGL policies for the consequential water damage caused by Portland Plastering.

II.    Coverage Limited to a Single $500,000 Occurrence

Next, the Ninth Circuit directed the district court "to conduct further factual development" on the question of whether coverage is limited under the CGL policies to a single $500,000 occurrence. Simply put, does a single $500,000 limit apply to the consequential water damage claim, or were there multiple "occurrences" such that the successive SAFECO CGL policies were implicated. The declarations for the 1996-97 CGL policy and the 1997-98 CGL policy each set forth a $500,000 limit for each occurrence. (Baran Decl. App. 264, 279.) The declarations for the 1998-99 CGL policy and the 1999-00 CGL policy each set forth a $1,000,000 limit for each occurrence. (Murphy Aff. Ex. C.)  The SAFECO CGL policies define the term "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Baran Decl. App. 290.)

According to SAFECO, the damage to the Hotel resulted from "continuous or repeated exposure to substantially the same general harmful conditions;" namely, flawed work and moisture infiltration. SAFECO relies on Bredal's testimony to argue that the damage started as soon as the Hotel was completed, and continued until the Hotel was repaired. (Baran Decl. App. 105 (Bredal Dep. 25:3-24).) SAFECO reasons that to the extent the loss involved an "occurrence," there was only one and it is subject to a single $500,000 limit.

Page 15 - FINDINGS AND RECOMMENDATION                                        [LB]

SAFECO challenges MW Builders' contention that the water damage claim involves multiple occurrences under successive policies based on *St Paul Fire & Marine Ins. Co. Inc. v. McCormick & Baxter Creosoting Co.*, 324 Or. 184, 200-202, 923 P.2d 1200 (1996). According to SAFECO, *St. Paul Fire & Marine,* holds that when a loss progresses *undiscovered* during the terms of several successive policies, the loss can trigger coverage under each separate policy. Here, both the cause of the loss and the damage it was causing to the Hotel was discovered in 1997, and any additional loss or damage did not involve a new or separate occurrence. Because the loss resulted from continuous or repeated exposure to substantially the same general harmful conditions, the loss implicates only one $500,000 limit, no matter how many years the policy was in effect.

Rather, SAFECO directs the court to the decision in *Cleveland Board of Education v. R.J. Stickle International*, 76 Ohio App.3d 432, 602 N.E.2d 353 (1991), in which the insured installed a roof that leaked whenever it rained. The first leaks were discovered shortly after the roof was installed, but the roof was not completely repaired until several years later. SAFECO explains that the central issue in the case was whether the loss triggered coverage under all of the insured's policies that were in effect from the time the leaks began until the roof was repaired. In concluding that only the policy in effect when the leaks were first discovered was triggered, the court in *Stickle* stated:

> The rationale for this conclusion is that the roof began to leak in 1975, making it a real possibility that the roof would continue to leak every time it rained. Clearly, the knowledge of this possibility increased with every water entry problem and resulting damage. Therefore, the resulting damage was not unusual, unexpected, or unforeseen and not an accident. The absence of an accident necessarily precludes the existence

of an occurrence under the definition contained within the policies in existence from 1976 to 1988.

602 N.E.2d at 436-437.[1]

Additionally, SAFECO asserts that the "known loss" doctrine, which operates to bar an insured from obtaining coverage for a loss that has occurred, or is certain to occur, is implicated here. (Def.'s Mem. Pursuant to Order 19 (and cases cited therein).)  SAFECO maintains that Portland Plastering knew in 1997 that damage would continue to occur unless comprehensive repairs were made.  Thus, MW Builders, standing in the place of Portland Plastering, cannot claim coverage under any later issued CGL policy for the known loss.  Rather, this claim is subject to the $500,000 per-occurrence limit of the single policy that was in place in 1997.

Finally, in accordance with the Ninth Circuit's ruling, SAFECO paid the attorney fees and costs awarded to MW Builders by Knoll totaling $285,544.30.  This court previously determined that $42,832.50 of this amount was covered under the supplementary payments provisions of the Portland Plastering policy, which does not reduce the policy limit.  SAFECO charges, however, that the balance of the payment ($242,711.80) reduces the available coverage limit for any consequential water damage repairs to $257,288.20.

Conversely, MW Builders claims that "SAFECO concedes that the faulty EIFS installation work of Portland Plastering triggered the 1996-1997 policy" and challenges SAFECO's assertion that coverage is precluded under multiple policies.  MW Builders asserts that the property damages to the Hotel began in 1997, and continued until the time of Mega Pacific's repairs in 2000.  (Pl.'s

---

[1]    MW Builders alleges in its response brief that a subsequent, unpublished decision of the Ohio appellate court calls the decision in *Stickle* into question:  "[T]he *Stickle* court cited no authority, however, in support of this proposition, and it characterized this statement of law as an alternative holding."  (Pl.'s Resp. Summ. J. 15 n.5 (and case cited therein).)

Resp. Summ. J. 12.) As such, MW Builders is not limited to a single $500,000 per occurrence limit, under the four successive CGL policies issued by SAFECO. According to MW Builders, it is "uncontroverted that the faulty work caused property damages to the [H]otel after the completion of Portland Plastering's initial work in June 1997[,] and that these damages continued until September 2000[,]" implicating the $500,000/$1,000,000 per occurrence limits on each of the successive CGL policies. (Pl.'s. Mem. Summ. J. 24.)

Citing Oregon law, MW Builders contends that where an occurrence during a policy period causes continuing damage over several policy periods, coverage is triggered under every policy applicable thereafter. *See St. Paul Fire & Marine*, 324 Or. at 207-08. MW Builders asserts that courts have applied the same "actual injury" or "injury in fact" rule to find coverage under successive policies that contained the same definition of "occurrence" as the CGL policies here and in virtually identical circumstances. *See Century Indemnity Co. v. Golden Hills Builders, Inc.*, 348 S.C. 559, 561 S.E.2d 255 (2002) (applying continuous trigger theory to same policy language in SAFECO policies to hold that coverage for harm for moisture intrusion behind stucco cladding continues under each policy period that the harm manifests).

According to MW Builders, no one knew the cause and extent of the water infiltration and resulting property damages. Portland Plastering performed additional work in September 1998, and Larkspur believed the water intrusion issues had been resolved. Investigation later determined that this was not the case. MW Builders alleges "[i]t is undisputed that the September 1998 repairs were faulty and not only failed to stop the water infiltration, but exacerbated the property damages to the Hotel and caused new, additional damages." (Pl.'s Resp. Summ. J. 13 (and citations therein).)

Further, MW Builders challenges SAFECO's known loss argument because the cause of water infiltration and the extent of the resulting property damages was not known in 1997. In fact, MW Builders alleges there is no evidence regarding what Portland Plastering knew in 1997. MW Builders points out that Knoll concluded in his Interim Decision that Portland Plastering continued to deny any responsibility for the water infiltration issues even as late as July of 1999. Further, Knoll determined that "MW Builders was unable to determine the source of the water infiltration damages at the site at any point in 1999" and that "Larkspur was unable to determine the source of the water infiltration damages at the [H]otel until after Jan Bredal performed his destructive testing in the spring of 2000." (Pl.'s Resp. Summ. J. 14 n.4.)

In sum, MW Builders argues that the undisputed evidence establishes the Hotel suffered property damages continuously from 1997, through 2000, triggering coverage under each of the four SAFECO CGL policies issued to Portland Plastering (with limits totaling $3 million). Accordingly, even if the court determines that the applicable policy limits are reduced by SAFECO's payment of the $242,711.80 in attorneys' fees and costs, there is adequate coverage for the $620,000 settlement award.

Under Oregon law, actual injury must occur during the policy period in order to trigger a policy's coverage. *See St. Paul Fire & Marine,* 324 Or. at 200-02. In *St. Paul Fire & Marine,* the Oregon Supreme Court rejected the trial court's adoption of the manifestation trigger, which provides that a policy is triggered when the injury or damage becomes apparent, and instead adopted an injury-in fact-trigger. *Id.* In so doing, the court noted that the "operative phrase in the trigger clauses contained in the caused-by-accident policies is 'during the policy period.'" *Id.* at 201. Thus, coverage under the policies at issue did not turn on the discovery of property damage or on the

establishment of the insured's financial responsibility or liability. *Id.* Rather, the court held that so long as there was property damage during the policy period, the policy was triggered. *Id.* at 201-02.

Similarly, the SAFECO CGL policies cover property damage that occurred during the policy period. The CGL policies at issue provide that SAFECO will "pay those sums that the insured [Portland Plastering] becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." (Murphy Aff. Ex. C at 4.) The insurance is triggered by "property damage" that "occurs during the policy period." (Murphy Aff. Ex. C at 4.) As set forth in *St. Paul Fire & Marine,* if property damage occurs at some point during the course of the policy period, coverage is triggered.

Additionally, this court explained in *Stimson Lumber*, that the "'trigger' theory is commonly referred to as the actual injury or injury-in-fact trigger of coverage" and "courts applying this trigger theory have found coverage exists under every policy that was in effect during the time periods in which damage to property actually occurred, even if the damage was discovered long after it began." 2004 WL 1173185, at *13; *see also Woodale Builders, Inc. v. Maryland Casualty Co.*, 722 NW.2d 283, 292 (Minn. 2006) ("a liability policy is 'triggered' if the complaining party . . . is actually damaged during the policy period, regardless of when the underlying negligent act occurred"); *Century Indemnity Co.*, 348 S.C. at 564 (applying a "modified continuous trigger theory" to find that the policy provided "coverage for property damage that occurred during the policy period *and* for any continuing damage" (emphasis in original)).

Here, there is no dispute that Portland Plastering's faulty work caused damage to the Hotel that occurred after the original work was substantially completed in June 1997. Further, evidence

in the record supports a finding that the damage to the Hotel continued until September 2000. Bredal

testified as follows:

> I performed investigation (including invasive testing by removing sections of EIFS
> to inspect the interior wall damages) in early 2000 and was also present during the
> repairs conducted between July 2002 and May 2003. Based on my experience,
> training, and my observations at the site, I conclude that the property damage at the
> hotel occurred continuously beginning in June 1997 through September 2000. When
> I observed the rot, fungal decay, and disintegration of the structural components of
> the building during the invasive testing in 2000, I confirmed that the property damage
> caused by the faulty EIFS installation and sealant work had been occurring
> continuously over a period of years. Water would periodically enter the building as
> a result of the improper work of Portland Plastering and its subcontractor Spectra
> Caulking. Each rain and storm event would result in water entering the wall spaces
> and cause new property damage to framing, sheathing and other structural
> components of the hotel. The water would enter the wall cavities and become trapped
> causing rot, growth of mold and fungus, and general deterioration of the interior
> structural components of the building. It is not possible to specifically identify each
> stud, header, joist, sheet of sheathing, or other component that rotted on a given day.
> Rather, based on my experience and training I have concluded that the water damages
> to the hotel components occurred continuously during the June 1997 through
> September 2000 time frame.

(Bredal Aff. ¶ 18.)   SAFECO neither disputes the statements in the Bredal affidavit nor offers

competent evidence to controvert Bredal's testimony that "property damage at the hotel occurred

continuously beginning in June 1997 through September 2000."

Finally, the arbitrator Knoll determined that "MW Builders' claims against Portland

Plastering relating to water damage caused by the improperly installed EIFS were not discovered

until after December 31, 1998." (Baran Decl. App. 252.)  In fact, Knoll found:

> The preponderance of evidence established that Larkspur and MW Builders
> expended significant efforts to determine the cause of the water infiltration damages,
> but had not discovered the causes until after December 22, 1998.
>
> . . . .

Jim Hansen of Larkspur also testified that Larkspur was unable to determine the source of the water infiltration damages at the hotel until after Jan Bredal performed his destructive testing in the spring of 2000.

Portland Plastering performed repair work at the structure in September 1998. After that repair work was completed, it is undisputed that both MW Builders and Larkspur believed that no problems with the hotel continued to exist. . . . Until the spring of 1999, Larkspur was not aware of any additional problems at the hotel regarding water infiltration. . . . Tim Chadwick also testified that he personally spoke with a Larkspur representative . . . who confirmed that, after the September 1998 repairs were completed, no further problems or complaints existed with Larkspur until the spring of 1999.

(Baran Decl. App. 250-51.) SAFECO has not challenged Knoll's findings that the cause of the water infiltration went undiscovered until after 1998. Nor has SAFECO offered evidence to controvert Knoll's finding that the source of the water infiltration was unknown in 1997 and 1998.

Based on the uncontroverted evidence in the record, the court finds that the property damage to the Hotel began after its substantial completion in June 1997, and continued through 2000. As cited above, Oregon law finds coverage under a CGL policy for property damage that occurs during a policy period. Accordingly, coverage under each SAFECO CGL policy in effect from June 1997, until September 2000, has been triggered.

III.    Coverage for MW Builders as an "Additional Insured"

Previously, this court determined that MW Builders was not an "additional insured" under SAFECO's 1996-1997 CGL Policy No. 01-CD-229396-5, but was an "additional insured" under SAFECO's 1997-1998 CGL Policy No. 01-CD-229396-6; 1998-1999 CGL Policy No. 01-CD-229396-7; and, 1999-2000 CGL Policy No. 01-CD-229396-8. *See MW Builders, Inc.,* No. 02-1578-AC (J. Haggerty's Order dated May 15, 2005). As such, MW Builders was entitled to coverage for damages occurring during those policy periods; that were caused by Portland Plastering's "ongoing

operations;" and were covered by the terms of those policies. (MW Builders' status as an "additional insured" would end upon the completion of Portland Plastering's work.)

Although the Ninth Circuit did not disturb this court's findings regarding MW Builders' status as an "additional insured" under the enumerated policies, it remanded the issue of whether, as an additional insured, MW Builders was entitled to coverage for damages occurring during the policy periods that were caused by Portland Plastering's "ongoing operations." In a footnote, the Ninth Circuit stated that "[I]n light of this court's ruling, MW Builders may not wish to pursue this alternative form of liability." *MW Builders Inc.*, 267 Fed. Appx. at 555 n.2. Additionally, in its opening brief, MW Builders stated that: "This court should conclude that all of the damages incurred by Larkspur are covered pursuant to [SAFECO's] obligations to Portland Plastering as its primary insured. *An additional, independent basis for insurance coverage exists based on MW Builders' status as an additional insured.*" (Pl.'s Mem. Summ. J. 23 (emphasis added).)

This court has determined that more than one SAFECO CGL policy has been triggered, thereby providing MW Builders full recovery for Portland Plastering's covered damages. Thus, the court need not reach the question of whether, as an "additional insured," MW Builders is entitled to coverage for damages occurring during the policy periods that were caused by Portland Plastering's "ongoing operations."

*Conclusion*

Based on the foregoing, MW Builders' Renewed Motion for Summary Judgment Following Ninth Circuit Remand (doc. #232) should be, granted, in part, and denied, in part. Further, SAFECO's Motion for Summary Judgment Pursuant to July 9, 2008 Order (doc. #228) should be denied.

*Scheduling Order*

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due **February 11, 2009**.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 28th day of January 2009

JOHN V. ACOSTA
United States Magistrate Judge